J-S42018-24        2025 PA Super 70

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JARED RAHIM ABDUL-ALI :
:
Appellant : No. 588 MDA 2024

Appeal from the Judgment of Sentence Entered April 12, 2024
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s):  CP-54-CR-0000443-2023

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

OPINION BY BECK, J.:                          **FILED: MARCH 24, 2025**

Jared Rahim Abdul-Ali ("Abdul-Ali") appeals from his judgment of sentence imposed by the Schuylkill County Court of Common Pleas ("trial court") following his conviction for first-degree murder and other crimes committed against Destiny Duckett ("Duckett"), the mother of his two-month-old child, A.C.  Abdul-Ali argues that the trial court erred by failing to suppress inculpatory statements and abused its discretion in admitting evidence of prior abuse involving the victim.  We affirm.

At approximately 11:00 a.m. on Monday, February 13, 2023, Jennifer McCabe, the manager of Duckett's apartment complex, performed a wellness check after Duckett's family was unable to reach her.  N.T., 4/1/2024, at 65.  McCabe saw Duckett's deceased body on the bedroom floor.  *Id.* at 67.  A.C. was crying nearby.  *Id.* at 69.  She called 911, and police officers observed signs of a struggle.  *Id.* at 93.  A forensic pathologist, Dr. Wayne Ross, opined

that the assailant used a "ligature … to pull into the front and sides of the neck from behind." N.T., 4/2/2024, at 150. The autopsy also indicated that the attacker manually strangled Duckett "with dual hands in the front and the back compressing the neck[.]" *Id.* at 150-51. Additionally, bruising to Duckett's heart and lungs indicated that the attacker applied "a tremendous amount of force … on top of [her] chest" during the attack. *Id.* at 161. Dr. Ross opined that, based on rigor mortis and body temperature, Duckett died no later than 5:00 a.m. on February 13. *Id.* at 170. He agreed that the death could have occurred sometime between 8:00 p.m. Sunday to 1:00 a.m. Monday. *Id.*

Detective Joseph Krammes knew that Duckett had a protection from abuse ("PFA") order against Abdul-Ali and the detective thus visited My Father's House, a homeless shelter that Abdul-Ali was known to frequent. N.T., 4/1/2024, at 94. At approximately 1:15 p.m. he spoke to Abdul-Ali, who was crying and claimed that "he had a 'gut feeling' that something bad had happened to somebody close to him." *Id.* at 95-96. Abdul-Ali voluntarily accompanied officers to City Hall, where Detective Krammes and Captain Kirk Becker interviewed him. *Id.* at 98-99. The officers read Abdul-Ali his *Miranda*[1] warnings, and Abdul-Ali signed a waiver before speaking with the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 2 -

officers. A little over an hour after the interview had commenced, Abdul-Ali invoked his right to silence.

Three days later, officers executed a search warrant for Abdul-Ali's DNA; he agreed to speak with them again at their offering and was transported to City Hall for another interview. N.T., 4/2/2024, at 219-20. Abdul-Ali admitted during this conversation with police that he had visited Duckett on the evening of the 12th and violated the PFA order. Trial Court Opinion, 6/25/2024, at 6.[2] He claimed Duckett told him "she wished she could 'put the PFA in the past,' and was getting it dropped.'" *Id.* at 7. Abdul-Ali saw scratches on her neck, which she claimed was from their child. *Id.* He explained that if neighbors heard sounds from the apartment, it was because he "did not believe" her story. *Id.* He "was always asking her if she was having sex with other men," *id.* at 8, and argued with her because "he was trying to 'figure out' who had been in the apartment." *Id.* at 7. However, he stated that he calmed down after their discussion and he and Duckett had sex that evening, with her asking him to put his hand on her neck. *Id.* at 12. He denied strangling her and stated that Duckett was fine when he left her apartment that evening.

---

[2] All interviews were recorded and substantial portions were played to the jury. However, the videos were not included in the certified record. "It is an appellant's duty to ensure that the certified record is complete for purposes of review." *Commonwealth v. Reed,* 971 A.2d 1216, 1219 (Pa. 2009) (citation omitted). The trial court's opinion transcribed the key portions, and Abdul-Ali does not contest its accuracy. Indeed, he quotes the trial court's transcription in his brief before this Court. *See* Abdul-Ali's Brief at 19. We therefore rely on those transcriptions so that we can adjudicate Abdul-Ali's appeal.

*Id.* at 8. Abdul-Ali claimed that he left the apartment at her request as "she did not want him to get in trouble" because of the PFA. *Id.* at 13. He stated he rode his bike to a location near a church, where he spent the evening. *Id.*[3] He insisted that Duckett was unharmed when he left the building, and the interview ended when Abdul-Ali invoked his right to an attorney, which occurred after he invoked his right to silence once again.

While being transported back to prison, Abdul-Ali offered to show police where he had slept that evening. *Id.* at 14. Upon reaching the location, Abdul-Ali asked if he could "speak again about [Duckett]'s death and the investigation." *Id.* at 15. During this final interview, Abdul-Ali claimed he and Duckett argued about a movie Duckett had shown to their child. According to his statement, Duckett "attacked him," and he "tried to calm [her] down by restraining her and putting his hands on her neck for her to go to 'sleep.'" *Id.* He said that Duckett then "calmed down, told him to let go, and … started to snore[.]" *Id.* He then left the apartment "because he did not want to get in trouble for being there." *Id.* at 16. He insisted that Duckett was breathing when he left and that he did not use any kind of ligature. *Id.*

Abdul-Ali filed a motion to suppress all statements made to police after he terminated the interview on February 13 by invoking his right to silence. He averred that his decision to submit to an interview on February 16 at City

---

[3] Abdul-Ali stated he had left his jacket and other "stuff" at this location. *See* Trial Court Opinion, 6/25/2024, at 14.

Hall should be suppressed because he had "indicated he no longer wished to talk" on February 13 and the officers violated the Fifth Amendment by attempting to resume questioning. Motion to Suppress, 7/17/2023, ¶ 9. Turning to the statements given after the first February 16 interview concluded, which occurred in the police vehicle after leaving City Hall, Abdul-Ali noted that he had invoked his right to an attorney prior to those conversations. He argued that all subsequent statements had to be suppressed as the "police violated [Abdul-Ali]'s Fifth Amendment rights[.]" *Id.* Specifically, he argued that the police failed to "contact[] an attorney … or allow[] him to try to contact an attorney" before conducting another interview. *Id.* ¶ 8. In a supplemental motion, Abdul-Ali included additional factual allegations and cited a violation of his Sixth Amendment rights.

> It is hereby alleged that, by asking [Abdul-Ali] to speak with police after he clearly indicated he no longer wished to talk, by continuing to engage with [Abdul-Ali] after he asserted his right to remain silent a second time and clearly asserted his right to counsel, and then by questioning him yet again, police violated [Abdul-Ali]'s Fifth and Sixth Amendment rights and any and all statements should be suppressed.

Amended Motion to Suppress, 9/18/2024, ¶ 12.

The trial court held a hearing, at which Captain Becker testified and the videotaped interviews and *Miranda* waivers were admitted into evidence. The trial court memorialized its factual findings and legal conclusions in an order and opinion granting in part and denying in part Abdul-Ali's motion.

Abdul-Ali proceeded to a jury trial at which the Commonwealth presented additional evidence linking Abdul-Ali to the murder, including multiple pieces of surveillance video. Footage showed Abdul-Ali leaving a CVS at 6:50 p.m. on Sunday, and a Dollar Store at 7:16 p.m. N.T., 4/2/2024, at 186, 188. In both videos, Abdul-Ali is seen buying items that were found near Duckett's body (a ring and a box of chocolates). These stores are about two miles from Duckett's apartment. *Id.* at 195. At 7:37 p.m., the cameras at Duckett's apartment complex captured a person believed to be Abdul-Ali entering her apartment building. *Id.* at 200. At 12:47 a.m., that individual is depicted exiting. *Id.* at 205. Detective Krammes testified that he and McCabe watched the security footage to note every person who entered and exited the building from Sunday evening through Monday morning. *Id.* at 210. McCabe testified that the only other people seen entering and exiting, other than the man believed to be Abdul-Ali, were tenants known to her. N.T., 4/1/2024, at 71-73.

The Commonwealth also searched Abdul-Ali's phone and learned he had visited a website titled, "Can you strangle someone and not leave a mark?" N.T., 4/3/2024, at 278. Abdul-Ali also viewed an online presentation from a Texas district attorney's office titled, "Police say she was strangled, how do I prove it?" *Id.* at 281. The Commonwealth established that the phone visited these sites before McCabe called 911. *Id.* at 278.

The jury convicted Abdul-Ali of first-degree murder, aggravated assault, strangulation, and endangering the welfare of a child. Thereafter, he filed this timely appeal. He raises two claims for our consideration:

1. Did the trial court err in failing to suppress [Abdul-Ali]'s last incriminating statement as [Abdul-Ali] had asserted both his right to remain silent and his right to [c]ounsel prior to being alone in an vehicle with one of the investigating officers and then indicating that he wished to talk to officers again without any effort to obtain counsel for [Abdul-Ali] prior to interview?

2. Did the trial court err in admitting evidence of … [Abdul-Ali]'s prior bad acts, specifically that the victim had been granted a [PFA order] along with the underlying facts of the injury involved with the criminal charge which was the basis to obtain said PFA?

Abdul-Ali's Brief at 7.[4]

## **Suppression of Statements**

Abdul-Ali's first issue alleges that the trial court erred in failing to grant his motion to suppress. *Id.* at 16-22. In its written opinion granting in part and denying in part his suppression motion, the trial court found that Abdul-Ali signed two *Miranda* waivers during the initial interview on February 13, with the first signed at approximately 1:20 p.m. This "initial investigatory questioning involved matters concerning the PFA violation." Trial Court Order and Opinion, 1/10/2024, at 5. After about thirty minutes, questioning "changed focus to the suspected homicide of Duckett," and Abdul-Ali was "again read the *Miranda* warnings." *Id.* He signed a second *Miranda* waiver

---

[4] While Abdul-Ali's issue as presented is limited to his "last incriminating statement," his brief also challenges the denial of suppression of the statements given during his first interview on February 16.

at 1:52 p.m., and "[a]t some point … indicated that he no longer wished to talk with police[.]" *Id.* Abdul-Ali stated, "I am just going to end this conversation. I am not saying nothing else no more." *Id.* at 6. He did not request an attorney. *Id.* He was then arrested for the PFA violation, arraigned, and transported to the Schuylkill County Prison. *Id.*

The trial court observed that following the DNA swab on February 16, one of the officers[5] mentioned their conversation from the February 13 interview and said, "we had a lot of questions … some of which we got answers to, some of which we didn't." *Id.* at 7. He asked if Abdul-Ali would "go back down to City Hall and talk, if you're agreeable to it." *Id.* The officer told him, "I'm not forcing you to" go down and speak. *Id.* The conversation at the jail "was cordial and lasted about seven minutes." *Id.* at 8. Abdul-Ali was then transported to City Hall, where he again waived his *Miranda* rights and spoke to the detectives. *Id.* at 9. Abdul-Ali stated at some point that he wished to stop speaking*.* The trial court determined that "the police improperly continued to talk to [Abdul-Ali] about Duckett's death" after he had stated "that he did not want to talk anymore." *Id.* "However, [those attempts] clearly ended" after Abdul-Ali stated, "Then I want a lawyer. I'm going to get a lawyer and do what I need to do to figure it out." *Id.* at 13. At that point, the interrogation ended, and Abdul-Ali was removed from the room. *Id.*

---

[5] The order and opinion does not specify which officer.

As Abdul-Ali was taken from the interrogation room to go back to the prison, the trial court found that he "initiated [an] exchange," starting with the comment, "I'm being charged with something I didn't do, [r]ight?" *Id.* An officer replied, "Nope. I haven't done that yet in the history of my career and I ain't gonna start now. I'm gonna charge you with what you did do." *Id.*

The trial court found the next relevant conversation occurred in the police vehicle, when Abdul-Ali "began ... discussion" about how the Commonwealth would "prove what happened." *Id.* Then, "[a]s the car was leaving the parking lot for the trip ... [Abdul-Ali] asked, without prompting, 'Should I show you where I was at?' Detective Krammes responded, 'Yeah, we can go there quick.'" *Id.* at 14. During the drive, Abdul-Ali "continued to engage with the police" and showed them where to go to find his jacket and other items left behind. *Id.* When the car stopped at the indicated location, Detective Krammes searched the area while "[Abdul-Ali] remained in the police vehicle with Captain Becker." *Id.*[6] Eventually, Abdul-Ali was asked if he could show Detective Krammes the exact location, which he agreed to do. "Upon locating the building, [Abdul-Ali] asked, 'You think after this, umm, we

_____

[6] Detective Krammes' body camera was turned on throughout the interaction with Abdul-Ali. Captain Becker's camera, however, was not. Thus, the interaction between Captain Becker and Abdul-Ali while Detective Krammes searched the area was not captured. *See* N.T., 10/23/2023, at 32, 35. Captain Becker turned it on at some point once he realized it was not recording.

could talk a little more?'" *Id.* After a brief exchange, "Captain Becker then asked, 'You want to talk again?' [Abdul-Ali] answered, 'Yeah.'" *Id.* The three spoke some more, and Abdul-Ali agreed to return to City Hall. *Id.* at 15. He then gave another statement after again waiving his *Miranda* rights. *Id.*

The trial court then applied the law to these factual findings, beginning with the officers' request to resume reinterrogation after executing the February 16 search warrant. The court explained that the relevant law was set forth by the United States Supreme Court in *Michigan v. Mosley*, 423 U.S. 96 (1975), which held that "the admissibility of statements from a person in custody who had previously asserted his right to remain silent ... depends on whether his 'right to cut off questioning was scrupulously honored.'" *Id.* at 16 (quoting *Mosley*, 423 U.S. at 104). The trial court noted that, as explained in *Commonwealth v. Russell*, 938 A.2d 1082 (Pa. Super. 2007), the following factors are considered: whether and when *Miranda* warnings were given, whether the first interrogation immediately ceased when the accused invoked the right to silence, whether the second interrogation occurred after a significant passage of time, whether the interrogation was conducted in another location, and whether the interrogation was conducted by different officers. Trial Court Order and Opinion, 1/10/2024, at 16-17.

The trial court noted that the second interrogation was conducted in the same location and by the same officers but deemed these factors minimally important because "prior to the second interrogation, [Abdul-Ali] was simply

- 10 -

asked whether he desired to continue to talk with the police." *Id.* at 18. Of far greater importance to the trial court's analysis was that three days had passed between the two interrogations. The trial court found that Abdul-Ali was free to turn down their request and be returned to his cell, and "[n]othing about the interaction between police and [Abdul-Ali] indicated that he had been subject to any inappropriate pressure, badgering, physical or mental coercion, or manipulation so as to interfere with his ability to voluntarily decide whether to talk with the officers." *Id.* Therefore, the trial court concluded, all statements made on February 16 up through his invocation of his right to silence at City Hall were admissible.

The trial court next considered Abdul-Ali's invocation of his right to counsel during the February 16 interrogation at City Hall. The court recognized that once a suspect has invoked his right to counsel, no reinterrogation may occur until he is provided counsel, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 20 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). The court concluded that Abdul-Ali did so while inside the police vehicle, as he "asked – without any prompting – whether he should show the police where he had slept the night of Duckett's death." *Id.* at 19. His "spoken desire to talk further with police after having left City Hall was not precipitated by any conduct or words of the officers encouraging, enticing, or coercing [Abdul-Ali] in any manner to talk again about their investigation." *Id.*

The trial court characterized Abdul-Ali's argument as being that "the use of all subsequent statements he made after the 16th after he first left City Hall" were "in violation of his Fifth Amendment right against self-incrimination." *Id.* at 22. The trial court agreed to the limited extent that "the police improperly continued to talk to [Abdul-Ali] about Duckett's death" after he had stated "that he did not want to talk anymore." *Id.* "However, [those attempts] clearly ended when [Abdul-Ali] was removed from City Hall." *Id.* The court observed that the Commonwealth conceded in its post-hearing brief "the problematic nature" of Abdul-Ali's statements from the time he invoked his right to silence through his offer to show the officers where he had been the night of February 12 through February 13. *Id.* at 22 n.6. The trial court accepted the concession, suppressing any statements made at City Hall after Abdul-Ali invoked his right to silence until he reinitiated communications with police; in all other respects, however, it denied his motion. *Id.*

> In reaching this conclusion, the [c]ourt has closely considered the police interaction with [Abdul-Ali] at City Hall and, in particular, that which occurred following his invocation of his right to remain silent on the 16th. The police did not then honor [Abdul-Ali]'s assertion of his right against self-incrimination. However, the interrogation had clearly ceased when [Abdul-Ali] was placed in the police vehicle, and he knew that he was on the return trip to prison. [Abdul-Ali] voluntarily, without prompting, offered to show the police where he slept. Likewise, he thereafter voluntarily, and similarly without any prompting by police, requested to talk to them again. The conduct of the police at City Hall in not observing [Abdul-Ali]'s right to remain silent did not result in [Abdul-Ali]'s subsequent requests of police. Rather, his statements at those times were not suggested or coerced by police but were the result of [Abdul-Ali]'s voluntary choice.

*Id.* at 21-22.[7]

On appeal, Abdul-Ali maintains that the trial court erred in its determination of "whether the invocation of the right to remain silent ha[d] been scrupulously honored[.]" Abdul-Ali's Brief at 17. As the Commonwealth conceded and the trial court accepted, Abdul-Ali "unambiguously asserted his right to remain silent on February 13, 2023[.]" *Id.* at 18. Abdul-Ali argues that the police failed to honor his wishes because "there was no significant passage of time" between the interrogations, nor was the interview conducted by different officers in a different location. *Id.* at 20. He additionally emphasizes that, during the February 16 interview, he "not only invoked his right to remain silent for a second time, he also invoked his right to counsel by stating that he wanted a lawyer." *Id.* Because the police did not allow him to consult with an attorney, "the last statement made … should have been suppressed in its entirety." *Id.* at 21-22.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence

---

[7] The trial court deemed Abdul-Ali's Sixth Amendment waived, as he "cited no legal authority supporting a Sixth Amendment … violation based upon the facts herein." Trial Court Opinion, 1/10/2024, at 22 n.7. Abdul-Ali did not argue that his arrest and arraignment for the PFA violations meant that the officers could not question him on the related homicide offenses. *See generally Texas v. Cobb*, 532 U.S. 162, 166 (2001) (rejecting notion that "right of counsel extends to crimes that are 'factually related' to those that have actually been charged").

- 13 -

for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Russell*, 938 A.2d at 1090 (citation omitted).

The Fifth Amendment to the United States Constitution states that "No person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. The seminal *Miranda* decision "held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431–32 (2000). *Miranda* and its progeny created procedural "safeguards ... to provide practical reinforcement for the right against compulsory self-incrimination." *Id.* Police must inform a suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. These rules were "developed to protect that right" against self-incrimination, *Michigan v. Tucker*, 417 U.S. 433, 439 (1974), and "are employed to dispel the compulsion inherent in custodial surroundings[.]" *Miranda*, 384 U.S. at 458.

The right invoked by the suspect (the right to remain silent or the right to counsel) limits the authorities in different ways. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to

remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. This language "does not state under what circumstances, if any, a resumption of questioning is permissible." *Mosley*, 423 U.S. at 101. *Mosley* listed factors for a court to consider when determining if the "'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. Where the suspect invokes the right to consult with a lawyer, however, law enforcement authorities are much more limited. *See Edwards*, 451 U.S. at 485 ("[I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."). "*Edwards* established a new test for when that waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication." *Solem v. Stumes*, 465 U.S. 638, 646 (1984).

Abdul-Ali invoked both rights at different points in the process. We discuss each instance separately.

<u>February 16 Interrogation – Right to Silence</u>

Abdul-Ali's motion to suppress did not challenge the admission of any statements given either at (1) his initial meeting with Detective Krammes at the My Father's House shelter on February 13, or (2) the interrogation at City Hall later that day. The termination of that interrogation forms the basis for his initial challenge to the reinitiation of questioning by police three days later, as the Commonwealth conceded that Abdul-Ali unambiguously invoked his

- 15 -

right to silence at the conclusion of the interrogation that occurred on February 13.

In **Mosley**, the United States Supreme Court addressed whether police may attempt to reinterrogate a suspect who invoked their right to silence. The police had arrested Mosley in connection with a string of robberies, and a detective led Mosley to the fourth floor of the police department's headquarters and read him his **Miranda** rights. **Mosley**, 423 U.S. at 97. Mosley "said he did not want to answer any questions about the robberies," and the detective "promptly ceased the interrogation." **Id.** Mosley was then arrested for those robberies and escorted to a cell block on the ninth floor. **Id.** "After an interval of more than two hours," **id.** at 104, a different detective brought Mosley down to the fifth floor of the department to question him about a homicide, a crime which was not discussed during the first interview. **Id.** Mosley waived his **Miranda** rights and gave a statement implicating himself in the homicide. **Id.** at 98.

The lower courts held that this was a per se violation of **Miranda**. **Id.** at 99. The High Court reversed. While language in **Miranda** indicated that "interrogation must cease" when the suspect invokes the right to silence, **Miranda**, 384 U.S. at 474, the **Mosley** Court declined to read that literally, finding that nothing in **Miranda** could "sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." **Mosley**, 423 U.S. at 102-03. A literal interpretation would

produce absurd results, as one reading would mean that a person could "never again be subjected to custodial interrogation by any police officer at any time or place on any subject." *Id.* at 101-02. The Court observed that the phrase could also be read to "permit a resumption of interrogation after a momentary respite," but acknowledged that this "would clearly frustrate the purposes of *Miranda*[.]" *Id.* at 102-03.

The *Mosley* Court thus adopted a "reasonable and faithful interpretation" of *Miranda*, noting that the decision described the right to silence as a "right to cut off questioning." *Id.* at 103 (quoting *Miranda*, 384 U.S. at 474). The Court determined that means the suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.* at 103–04. Therefore, admitting statements obtained after a suspect has invoked the right to silence "depends … on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104.

The Court concluded that the police "fully respected" Mosley's right to cut off questioning. *Id.* "[T]he police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106.

Abdul-Ali's argument that the trial court erred in applying these precepts

relies upon **Russell**'s identification of four factors to be considered:

> To determine whether the invocation of the right to remain silent has been scrupulously honored, the following factors are to be examined before deciding if any subsequent statement is admissible: [(1)] whether the accused was advised of the **Miranda** rights before both interrogations; [(2)] whether the first interrogation immediately ceased after the right was invoked; [(3)] whether the subsequent interrogation occurred after a significant time lapse; and, [(4)] whether the interrogation was conducted in another location by another officer.

Abdul-Ali's Brief at 17 (citing **Russell** at 1091)*.* He continues:

> When considering the factors set forth in **Russell**, **supra**, while police did advise [Abdul-Ali] of his **Miranda** rights for a third time, there was no significant passage of time, nor was the interview conducted in a different location by different police officers. Despite a lengthy interrogation just three days before, which concluded with the appellant invoking his right to remain silent, police took advantage of the execution of a search warrant to indicate that further information and information may be in appellant's best interest. It was not [Abdul-Ali] who initiated a new conversation, but rather police officers who inquired about his willingness to answer questions again.

*Id.* at 20.

Initially, to the extent Abdul-Ali invokes **Russell** as analogous, we

observe that **Russell** is not helpful to him. Indeed, in **Russell** we concluded

that the police did scrupulously honor the accused's right to silence with the

passage of time between the two interrogations spanning only two hours.

**Russell**, 938 A.2d at 1090-91. It is therefore unclear on what basis Abdul-

Ali argues that the three-day gap between interrogations was not a significant

passage of time.

In any event, contrary to Abdul-Ali's apparent contention, the four factors cited by *Russell* are not an exclusive list of what a court must consider when determining if there was a violation of the accused's right to remain silent during a subsequent interrogation. In *Commonwealth v. Henry*, we stated that whether the right to silence was scrupulously honored "necessarily is contextual." *Commonwealth v. Henry*, 599 A.2d 1321, 1325 (Pa. Super. 1991). We underscored that point in *Commonwealth v. Harris* when we stated that the factors discussed in *Mosley* are not exclusive. *See Commonwealth v. Harris*, 972 A.2d 1196, 1203 (Pa. Super. 2009). Instead of affording any one factor dispositive weight, we held that "a suppression court reviewing a statement made after the defendant's initial invocation of the right to remain silent must recognize as pivotal the purpose for which the renewed interrogation was conducted and the circumstances under which it occurred." *Id.*

Applying our settled precedent to the facts of this case, we find that the trial court did not err in denying this aspect of the suppression motion. First, the authorities spoke to Abdul-Ali three days after he invoked his right to silence, which, as the above-cited precedent confirms, was a lengthy passage of time. This is significantly more time than the two hours that elapsed between rounds of questioning in *Mosley*, which the High Court found to be sufficient without further commentary. *See Mosley*, 423 U.S. at 102. *Accord Russell*, 938 A.2d at 1090-91.

Abdul-Ali correctly identifies that the same two officers participated in both interrogations, those officers reinitiated the interrogation process after Abdul-Ali was compelled to submit to a DNA swab, and his invocation of his right to silence did not signal a willingness to talk at a later date. ***See, e.g., Russell***, 938 A.2d at 1091 (noting that the "initial assertion of [Russell's] right to remain silent was qualified, i.e., she indicated to Detective Rush that she did not wish to speak with *him* because she was angry with *him* for arresting her") (emphases in original). Nonetheless, ***Miranda*** is not violated simply because the same officers asked Abdul-Ali if he wished to continue an earlier conversation. Abdul-Ali does not cite a case holding that officers may only attempt to resume questioning if the suspect leaves open that possibility, and our independent research likewise reveals none. Instead, as stated in ***Harris***, we must "recognize as pivotal the purpose for which the renewed interrogation was conducted and the circumstances under which it occurred." ***Harris***, 972 A.2d at 1203. The reviewing court "should ask whether the official purpose of resuming questioning was to entice the arrestee to abandon his right to remain silent, or simply to find out whether he or she had a change of mind." ***Id.*** (quoting ***Commonwealth v. Mignogna***, 585 A.2d 1, 15 (Pa. Super. 1990) (Popovich, J., concurring)).

The context of the February 16 encounter indicates the purpose was simply to determine whether Abdul-Ali changed his mind about speaking with police. That Abdul-Ali did not indicate any willingness to talk and that the

request came after the DNA swab are relevant considerations in assessing the officers' purpose. Notably, however, Abdul-Ali did not claim that the circumstances under which the officers spoke to Abdul-Ali were coercive or that the officers compelled Abdul-Ali to submit to their request through psychological pressure or any other overt display of authority. The trial court observed the video of the interaction and concluded: "Nothing about the interaction between police and [Abdul-Ali] indicated that he had been subject to any inappropriate pressure, badgering, physical or mental coercion, or manipulation so as to interfere with his ability to voluntarily decide whether to talk with the officers." Trial Court Opinion, 1/10/2024, at 18.

Additionally, the trial court determined that Abdul-Ali "had been told specifically that he did not have to" speak with the officers. *Id.* This is not a case where the officers preceded their request to speak by reciting damning information or evidence in a way that suggests the purpose was to compel the suspect to speak. *Cf. Henry*, 599 A.2d at 1325 ("The obvious purpose of informing [Henry] of the warrant was to impress upon him the futility of his case, and the concomitant futility of remaining silent."). The officer did say "we know a lot more answers to some of the questions that we had" during the February 13 interview, but he paired that comment with an invitation for Abdul-Ali to "talk some more about what happened with [Duckett] and all the stuff that happened that day." Trial Court Opinion, 1/10/2024, at 7 (quoting video). The officer followed that by saying, "If you're agreeable to it, I'm not

forcing you to, but if you're agreeable to it, we can get you out of here, go back down to City Hall and talk, if you're agreeable to it." *Id.*

We agree with the trial court that "[t]here is no reason to believe [Abdul-Ali] did not know that he could say he was not interested in talking with the police, and return to his prison cell[.]" Trial Court Opinion, 1/10/2024, at 18. The original interaction shows that the police properly honored his invocation by immediately terminating the interrogation. *See Mosley*, 423 U.S. at 106 (citing the fact that the police "immediately ceased" the original interrogation as a factor in holding the later questioning was lawful). Relatedly, Abdul-Ali received a fresh set of *Miranda* warnings once transported to City Hall. He therefore had ample time to reconsider his decision during the ride to City Hall, as well as another chance at City Hall itself.

The officers' purpose of initiating the conversation with Abdul-Ali was to see if he changed his mind. The Constitution does not forbid officers from asking a suspect if they would like to speak. *See United States v. Washington*, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable."). Police expressly told Abdul-Ali that he could decline their invitation, and in conjunction with the long passage of time and absence of any argument that the officers coerced or compelled his agreement, we find that he maintained the right to "cut off questioning." *Mosley*, 423 U.S. at 104. We thus conclude that the officers "scrupulously honored" Abdul-Ali's

right to silence during the initial conversation on February 16. Accordingly, the statements made at the subsequent interview up through his invocation of the right to silence were properly admitted.

### February 16 Interrogation – Right to Counsel

After Abdul-Ali agreed to the interview at City Hall, he subsequently again invoked his right to silence. The officers continued to press Abdul-Ali, who then invoked his right to counsel. The trial court suppressed the statements made after invocation of his right to silence through Abdul-Ali's reengaging with police,[8] which occurred during the car ride back to prison, but found the statements he made once he started the conversation again were admissible.

As the trial court recognized, the rule set forth in **Edwards** barred the police from questioning Abdul-Ali after he invoked his right to counsel unless Abdul-Ali reinitiated the conversation. The trial court concluded that Abdul-Ali did so and based on its factual findings we agree with its conclusion of law. Abdul-Ali stated, "How ya gonna prove what happened?" **See** Trial Court Opinion, 1/10/2024, at 13 (quoting video). He "continued talking without any response by police" and as the car was leaving the parking lot Abdul-Ali stated, "Should I show you where I was at [the night of the 13th]?" **Id.** at 14. The officers said yes, and during the drive Abdul-Ali "continued to engage with the

---

[8] Abdul-Ali does not argue that the comments made after he invoked his right to silence but before he invoked his right to counsel are relevant to this inquiry.

police, directing them where to drive, and subsequently where to walk" to find the items he identified as belonging to him. *Id.* Detective Krammes could not find the location and Abdul-Ali "was eventually asked if he wanted to show … the exact location where he claimed to have slept." *Id.* Abdul-Ali agreed and when he located the building he asked, "You think after this, umm, we could talk a little more?" *Id.* Captain Becker asked, "You want to talk again?" and Abdul-Ali replied, "Yeah." *Id.* The group returned to City Hall where Abdul-Ali once again was given *Miranda* warnings and made incriminatory statements.

Abdul-Ali reinitiated communications with police when he asked, "How you gonna prove what happened?" We find persuasive the High Court's decision in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983) (plurality). In *Bradshaw*, the suspect invoked his right to counsel and the interrogation ceased. *Id.* at 1041-42. During the trip from the police station to the county jail, however, Bradshaw asked, "Well, what is going to happen to me now?" *Id.* at 1042. A plurality of the Court concluded "[t]here can be no doubt … [Bradshaw] 'initiated' further conversation in the ordinary dictionary sense of that word." *Id.* at 1045. The Court acknowledged that some questions, such as a request for a drink of water, are incidental to the custodial relationship and cannot be construed as an initiation. *Id.* Bradshaw's question, though, "was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1046. It "evinced a willingness and a desire for a generalized discussion about the investigation[.]" *Id.* at 1045-46.

Abdul-Ali's question likewise indicated a desire for discussion not just about the investigation, but about how the Commonwealth would prove its case based on what it already knew. This understanding is corroborated by the offer made by Abdul-Ali immediately thereafter to show police where he slept on the evening of February 12, presumably to prove that his jacket was still there.

Indeed, Abdul-Ali does not directly contest that he initiated conversations. Instead, he claims that "Captain Becker did say things that coerced him into offering another statement." Abdul-Ali's Brief at 21. At trial, Abdul-Ali testified that Captain Becker told him that "the only way for you to get through this is for you to admit to it …. If you can do that, then maybe we can talk to the judge to see what happens … and see about letting you go." N.T., 4/3/2024, at 354. Our review on appeal, however, is limited to the suppression record. **See In re L.J.**, 79 A.3d 1073, 1084 (Pa. 2013). Abdul-Ali did not testify at the suppression hearing; therefore, the record does not support this factual assertion.[9] Accordingly, for purposes of our review of this issue, there is no indication that Captain Becker said anything during the time

_____

[9] This issue was obliquely explored during the suppression hearing, when Captain Becker was asked why his body camera did not capture his conversation with Abdul-Ali. **See supra** note 6. Captain Becker stated that he did not coerce Abdul-Ali during that period, as their conversation was limited to where Detective Krammes should search. N.T., 10/23/2023, at 33. The trial court credited Captain Becker's testimony. **See** Trial Court Opinion, 1/10/2024, at 14 ("Captain Becker did not inquire about the homicide or suggest to [Abdul-Ali] that he resume answering questions about Duckett while the search by Detective Krammes was ongoing.").

the body camera was off to coerce Abdul-Ali to reinitiate communications. Therefore, Abdul-Ali's statements after he reinitiated communications with police were properly admitted.

## Prior Bad Acts Evidence

Abdul-Ali's remaining claim is that the trial court abused its discretion in granting, in part, the Commonwealth's motion to admit evidence under Pennsylvania Rule of Evidence 404(b).  "Admission of evidence rests within the discretion of the trial court, and we will not reverse absent an abuse of discretion." *Commonwealth v. Kinard*, 95 A.3d 279, 284 (Pa. Super. 2014) (en banc).

The Commonwealth filed a motion seeking to admit evidence that Abdul-Ali bit Duckett's lip, testimony from the police officer who observed the injury and took the report, a picture of the injury, the subsequent simple assault conviction for that attack, the existence of the PFA as based on that assault, and testimony from Duckett's cousin that Abdul-Ali had repeatedly strangled or punched Duckett.  The trial court

> limited the allowable evidence to the existence of the PFA order, the simple assault conviction, [the officer]'s testimony about having viewed the injury to [Duckett]'s lip, and testimony from [Duckett]'s cousin ... about the incident during which [Duckett] complained of being hurt by [Abdul-Ali] when he voiced his suspicions that [Duckett] was in contact with another man, the latter having occurred within days of her murder.

Trial Court Opinion, 6/25/2024, at 21.

Abdul-Ali notes that he was "willing to stipulate simply that a PFA was applied for [and] granted and that [Abdul-Ali] had been convicted of a simply [sic] assault, but attempted to keep out any underlying reference to the severity of the injury in that underlying factual scenario." Abdul-Ali's Brief at 24.

Relevant evidence is admissible. *See* Pa.R.E. 402; *see also* Pa.R.E. 401(a) ("Evidence is relevant if ... it has any tendency to make a fact more or less probable than it would be without the evidence[.]"). Rule 404(b)(1), however, specifically precludes evidence "of any other crime, wrong, or act ... to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence may be introduced for other purposes, though, including, but not limited to, "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). In criminal cases, "this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

The threshold question in a Rule 404(b) analysis is thus whether the evidence is relevant only to show a criminal defendant's propensity to behave in the same or similar manner, which Abdul-Ali submits was the case here. His argument in support of this claim states, in its entirety:

> Evidence of a PFA Order and testimony regarding a serious injury cause [sic] by [Abdul-Ali] in the past[] is far more prejudicial than probative and is highly likely to result in the jury thinking that if

[Abdul-Ali] had caused injury in the past that he has a propensity to cause injury and is more likely to have committed this crime.

Abdul-Ali's Brief at 23.

We disagree that the evidence was relevant only to show that because he previously assaulted Duckett, he was more likely to have been her killer. We find instructive our Supreme Court's decision in **Commonwealth v. Drumheller**, 808 A.2d 893 (Pa. 2002). In **Drumheller**, the Commonwealth sought the death penalty for Drumheller's murder of his on-again/off-again girlfriend, Carol Huttenstine, who filed four PFA petitions against Drumheller from July of 1996 through January of 1999, with the final order in effect on April 24, 1999, when Huttenstine was killed. **Id.** at 898. "Each of the PFA petitions contained recitations of acts of abuse perpetrated by Drumheller against Huttenstine, including numerous incidents where Drumheller punched Huttenstine in the face, pulled her hair, kicked her, threw her to the ground, choked her, and threatened to kill her." **Id.** Each PFA petition was entered into evidence. On appeal, Drumheller conceded that the 1999 PFA was admissible but argued that the first three were too remote in time to be admissible. **Id.** at 903-04. Our Supreme Court disagreed:

> While in the case sub judice the evidence of prior incidents of abuse stretches back to approximately thirty-four months before Huttenstine's death, there is no time limitation on when such evidence becomes inadmissible. In the present case, the evidence suggests that the abuse by Drumheller of Huttenstine continued during this entire three-year period. All four PFA petitions are relevant to demonstrate what the Commonwealth accurately characterizes as "the continual and escalating nature of Drumheller's abuse of Huttenstine." The challenged evidence

- 28 -

shows the chain or sequence of events that formed the history of the case, is part of the natural development of the case, and demonstrates Drumheller's motive, malice, intent, and ill-will toward Huttenstine.

*Id.* at 905 (footnote and citation omitted).

As in ***Drumheller***, the trial court here concluded that the "evidence of the volatile relationship was also pertinent to show [Abdul-Ali's] ill will, malice, motive, and intent, together with the history of their relationship and the natural development of the events of February 12-13." Trial Court Opinion, 6/25/2024, at 23. The ***Drumheller*** decision is in accord with the trial court's rationale, and we find no abuse of discretion. Moreover, as in ***Drumheller***, the trial court provided a limiting instruction to the jury, informing it of the purpose for which this evidence could be considered. N.T., 4/3/2024, at 398.

Finally, Abdul-Ali does not explain how the trial court abused its discretion in concluding that the probative value of the admitted evidence outweighed its potential for unfair prejudice. We find that the trial court did not err in its assessment, as many of Abdul-Ali's statements to police suggested that unspecified other sexual partners of Duckett may have committed the crime, and he also claimed that Duckett asked him to choke her during sex. Additionally, the Commonwealth's expert identified a long period of time in which Duckett could have been killed. Thus, we conclude that the trial court did not abuse its discretion in determining that the probative value of this evidence, all of which served to undermine Abdul-Ali's

given explanations, outweighed its potential for unfair prejudice. No relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/24/2025